IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

REHAN RANA,                          )
                                     )
            Petitioner,              )
                                     )
      v.                             )          Case No.  4:20-cv-01092-AGF
                                     )
UNITED STATES OF AMERICA,            )
                                     )
            Respondent.              )

**<u>MEMORANDUM AND ORDER</u>**

This matter is before the Court on Petitioner Rehan Rana's motion filed under 28

U.S.C. § 2255 to vacate, set aside, or correct his sentence in Case No. 4:18-cr-00770-

AGF-1 ("tax fraud case").  On September 18, 2018, Petitioner waived indictment and

pled guilty to Count 1 of the Information in the tax fraud case, submitting a false federal

tax return in violation of 26 U.S.C. § 7206(1).  The same day Petitioner entered a plea of

guilty to Count 1 in 4:17-cr-00297-AGF-8 ("health care fraud case"), conspiring to

violate the Anti-Kickback Statute in violation of 42 U.S.C. §§ 1320a-7b(b)(1) and 2.[1]

The Court accepted Petitioner's pleas, and on August 16, 2019, sentenced Petitioner to 24

months in prison on Count 1 of the health care fraud case, and 24 months in prison on

Count 1 of the tax fraud case, the sentences to run concurrently.  Petitioner was released

---

[1]     Petitioner also filed a motion under 28 U.S.C. § 2255 in relation to the health care
fraud case, alleging prosecutorial misconduct and ineffective assistance of counsel.  *See
Rana v. United States*, Case No. 4:20-cv-00194-AGF.  The petition was denied for lack
of merit on March 30, 2023.  *Id.*, Doc. Nos. 33-34.

from prison on January 14, 2022, and is currently serving his three-year term of supervised release.

In his motion under § 2255, Petitioner claims that his guilty plea on the tax fraud case was based in part on prosecutorial misconduct.  Specifically, Petitioner alleges that IRS Special Agent Scott Daniels urged Abdur Rashid Chaudhry (Petitioner's tax preparer) to approach Petitioner, who was represented at the time, and have Petitioner sign and backdate the Form 8879s for the 2013, 2014, and 2015 tax years, tax documents necessary for prosecution under 26 U.S.C. § 7206(1).

On March 15, 2023, the Court held an evidentiary hearing.  Petitioner was represented by his retained counsel, John Markham, at the evidentiary hearing.[2] Following the hearing, both parties submitted supplemental briefs in support of their arguments.  *See* Doc. Nos. 35-36, 41-43.  Based on the entire record and having the opportunity to observe and evaluate the demeanor of the witnesses at the hearing, Petitioner's motion will be denied.

## BACKGROUND

## Criminal Proceedings

In or about 2012, the United States Department of Health and Human Services, Office of the Inspector General, Office of Inspection ("HHS/OIG"), and the Federal

---

[2]     During his underlying criminal proceedings, Petitioner was represented by different counsel, including John Rogers and John Mueller.  Following his plea, Petitioner retained new counsel, David Helfry and Benjamin Wesselschmidt, and moved to continue the sentencing to permit new counsel to prepare.  Both Rogers and Mueller testified at the evidentiary hearing in this matter.

Bureau of Investigation ("FBI") opened a criminal investigation of Devon Golding, M.D. and his business partners and associates, including Petitioner, related to potential health care fraud.  HHS/OIG Special Agent Stacey Jordan was the case agent assigned to the investigation.

Based on information Special Agent Jordan discovered during her investigation, the United States Attorney's Office for the Eastern District of Missouri requested the Internal Revenue Service ("IRS") investigate whether Petitioner had committed any financial crimes.  On March 29, 2016, the Department of Justice, Tax Division, authorized an expansion of the grand jury investigation to include tax fraud.  IRS Special Agent Scott Daniels[3] and IRS Revenue Agent Sarah Parman were assigned to investigate whether Petitioner had committed any tax fraud.  Doc. No. 8-1, Special Agent Daniels Aff., at ¶ 1-11.

On January 31, 2017, Agents Daniels and Parman interviewed Petitioner's tax preparer, Abdur Rashid Chaudhry ("Chaudhry").  *Id.* at ¶ 14.  Chaudhry explained that he was only responsible for completing the necessary tax documents, such as Forms 1040, 1120S, 1065, 1099, and W-2, and he did not provide bookkeeping or other financial services to Petitioner.  Chaudhry stated that he reviewed all the finalized returns he prepared with Petitioner in person at Chaudhry's office.  *Id*. at ¶ 19.  The agents showed Chaudhry electronic copies of Petitioner's U.S. Individual Income Tax Returns for 2012,

---

[3]     In January 2017, Special Agent Daniels was reassigned to the Drug Enforcement Administration ("DEA") as a task force officer.  However, he continued to act as the case agent on Petitioner's tax investigation.

2013, 2014, and 2015 and the tax returns of St. Louis Hills Pharmacy for the same years. Chaudhry admitted that he prepared the returns based on the information provided by Petitioner.  *Id.* at ¶¶ 21-30.  The agents discussed these returns with Chaudhry in detail. *See id*.  At the conclusion of the interview, Agent Daniels served Chaudhry with a subpoena for all documents related to the preparation of Petitioner's income tax returns for the years 2013 through 2015.

On February 17, 2017, Agent Daniels and Agent Stacey Jordan followed up with Chaudhry, in part because they had not received the subpoenaed documents.  *Id.* at ¶ 32. Chaudhry explained that he was confused by the initial request, but would collect the requested documents.  *Id.*

On February 22, 2017, Agent Daniels received an e-mail from Chaudhry to his government e-mail account which contained a number of the subpoenaed documents.  *Id.* at ¶ 33; Doc. No. 8-2.  At the time, Agent Daniels was overburdened by his new assignment with the DEA and only gave Chaudhry's e-mail a cursory review.  Doc. No. 8-1 at ¶¶ 34-35.

Sometime prior to April 26, 2017, while preparing his investigation report, Agent Daniels reviewed the documents provided by Chaudhry.  It was at this time that Agent Daniels noticed that the signed Forms 8879 were not included in the documents Chaudhry provided.  Agent Daniels believes he called Chaudhry, requesting the documents, but acknowledges that Chaudhry may have sent them on his own volition. *Id.* at ¶ 36.  In any event, on April 26, 2017, Agent Daniels received an e-mail from

Chaudhry which contained digital copies of all the applicable signed Form 8879s.  *Id.* at ¶ 37.

On July 6, 2017, Agents Daniels and Jordan interviewed Muhammad Attique ("Attique"), the owner of Imran Pharmacy, where Petitioner was employed as a pharmacist, regarding a number of large fund transfers between Imran Pharmacy and Petitioner.  *Id.* at ¶¶ 38-46.  On August 11, 2017, Agents Daniels and Jordan interviewed Yusaf Beg ("Beg"), Petitioner's business partner at St. Louis Hills Pharmacy.  Beg informed the agents that Petitioner was withdrawing funds from St. Louis Hills Pharmacy that exceeded his basis.  *Id.* at ¶¶ 47-52.  On December 12, 2017, Beg appeared with his attorney at the U.S. Attorney's office for a proffer and provided additional information about Petitioner and St. Louis Hills Pharmacy, further implicating that Petitioner was perpetrating tax fraud.[4]  *See id.* at ¶ 53-70.

Agent Daniels and Parman concluded that, at the very least, Petitioner had taken distributions from St. Louis Hills Pharmacy that far exceeded his stated basis.  The agents were very conservative in their calculations and gave Petitioner the benefit of the doubt in multiple circumstances.  For example, Agent Parman calculated the payments from St. Louis Hills Pharmacy to Petitioner as distributions, which are taxed at the long-term capital gains tax rate, which is substantially lower than the ordinary tax rate.  *Id.* at ¶¶ 71-74.

---

[4]     In January 2019, Beg waived indictment and pled guilty to two felony counts of conspiracy and health care fraud, and was sentenced on October 25, 2019, to 5 years of probation.  *United States v. Beg*, Case No. 4:19-cr-0051-CDP-1.

The agents determined that Petitioner failed to report over $3.9 million dollars of distributions, which resulted in a tax due and owing of over $751,000.  *Id.* at ¶¶ 75-76. On January 12, 2018, the agents' report was sent to the Department of Justice Tax Division, which on March 29, 2018, authorized prosecution of Petitioner under the U.S. Tax Code.  *Id.* at 77.

<u>Indictment Waiver and Plea Hearing</u>

On September 18, 2018, Petitioner appeared before the undersigned with counsel[5] for a waiver of indictment and plea hearing.[6]  The Court confirmed that Petitioner was competent to waive his right to indictment and enter a plea.  Waiver of Indictment and Plea Hr'g Tr., Case No. 4:18-cr-00770-AGF, Doc. No. 96 at 4-8, 12-13.[7]  Petitioner also acknowledged that he had received a copy of the information that was filed in connection with the tax fraud case, had a full opportunity to review that charge with his attorney, and review all the evidence the Government had in support of the charge.

> THE COURT:  Have you in fact received a copy of the information that was filed in connection with this tax charge?
>
> PETITIONER:  Yes, Your Honor, I did.
>
> THE COURT:  Have you had full opportunity to review that charge with your attorney?

---

[5]     During this proceeding, Petitioner was represented by John Rogers.

[6]     The hearing regarding the waiver of indictment and plea on the tax fraud case was held at the same time as and partially consolidated with the plea hearing on the health care fraud case.

[7]     References to the docket in the underlying criminal tax fraud case will be referenced as "Crim. Doc. No."

PETITIONER:  Yes, Your Honor.

THE COURT:  And he has also reviewed with you the evidence that the Government has in support of this information?

PETITIONER:  Yes, Your Honor.

THE COURT:  All right.  And so you understand that in this information you are charged in one count with false and fraudulent statements that were provided under the Internal Revenue Code?

PETITIONER:  Yes, Your Honor.

*Id.* at 8-9.  Petitioner confirmed, under oath, that he understood his right to an indictment by a grand jury and that in waiving that right, the case would proceed against him on the United States Attorney's information just as though he had been indicted.  *Id.* at 10-12. Petitioner further confirmed that he had discussed his rights and the waiver with his attorney and wished to proceed with waiving his right to an indictment.

THE COURT:  Do you in fact, sir, wish to waive your right to proceed by the way of indictment of a grand jury and instead proceed on this charge on an information?

PETITIONER:  Yes, Your Honor.

*Id.* at 11-12.  The Court accepted Petitioner's waiver of indictment, finding that it was made knowingly, intelligently, and voluntarily.  *Id.* at 13.  The Petitioner was then formally arraigned on the tax fraud charge.

THE COURT:  Now, the next step in this process is for me to formally arraign you on this tax charge, sir.  And again you've had an opportunity to review the information itself, sir?

PETITIONER:  Yes, Your Honor.

THE COURT:  Do you wish me to read the information to you or do you wish to waive a reading of the information?

- 7 -

> PETITIONER:  I would like to waive it, Your Honor.
>
> THE COURT:  All right.  How do you wish to plead to the information? Guilty or not guilty?
>
> PETITIONER:  Guilty.

*Id.*

The Court then turned to the Petitioner's guilty plea in the 2017 health care fraud case, finding that Petitioner was competent to enter a plea of guilty and that his plea was made knowingly, intelligently, and voluntarily.  *Id.* at 54.  Upon returning to Petitioner's plea for the 2018 tax fraud case, the Court confirmed on the record that it had already found Petitioner competent to enter a plea.  *Id.* at 55.  Petitioner confirmed on the record that he understood that by pleading guilty he was waiving his right to trial and the rights associated with trial described by the Court.  *Id.* at 57-58.  Petitioner confirmed that he had reviewed the plea agreement with his attorney, and everything in the plea agreement was true to the best of his knowledge.  *Id.* at 58.

Petitioner then specifically confirmed that the facts contained in the plea agreement were true.  *Id.* at 64.  Upon the request of the Court, the government summarized the relevant facts on the record.

> THE GOVERNMENT: To assist with the preparation of his tax returns for the relevant years, he employed the services of Tax Consulting Associates and an accountant there assisted him with this.  However, it's significant that the accountant did not do the bookkeeping, did not have access to the bank records of either [Petitioner] as an individual or his businesses, thus the tax preparer was not in a position where he could check the accuracy of the records that were provided by [Petitioner].  In fact [Petitioner] provided all of the information to this tax preparer ….  [Petitioner], by providing the information to his tax preparer, caused the creation, issuance and filing of

- 8 -

false documents related to his tax returns and signed the forms that are required to authorize the submission of those forms, specifically Forms 8879 and 8879S.

*Id.* at 65-66.

Petitioner again reaffirmed to the Court that the facts, as set forth in the plea agreement, and as described by the prosecutor on the record, were true.

> THE COURT: All right.  Mr. Rana, have you heard everything that's just been said here?
>
> PETITIONER: Yes, Your Honor.
>
> THE COURT: Is everything that [the Prosecutor] said in fact true?
>
> PETITIONER: Yes, Your Honor.
>
> THE COURT: Is that what you did in this case?
>
> PETITIONER: Yes, Your Honor.
>
> THE COURT: And did you know what you were doing?
>
> PETITIONER: Yes, Your Honor.
>
> THE COURT: Did you in fact for the years 2013, 2014 and 2015 provide incorrect and materially understate the amount of distributions that you had received to your tax preparer?
>
> PETITIONER: Yes, Your Honor.
>
> THE COURT: And in the amounts that are set forth in this plea agreement?
>
> PETITIONER: Yes, Your Honor.
>
> * * *
>
> THE COURT: And did you in fact sign a tax return on or about October 15, 2014, that materially understated your taxes?
>
> PETITIONER: Yes, Your Honor.

THE COURT: And did you sign that under penalty of perjury?

PETITIONER: Yes, Your Honor.

THE COURT: And did you understand what you were doing?

PETITONER: Yes, Your Honor.

THE COURT: And did you know that you were in fact signing a false tax return in order to pay less income tax than you in fact owed?

PETITIONER: Yes, Your Honor.

THE COURT: All right. And as a result of that underreporting, are you acknowledging that you owe $751,787 in income tax for the years 2013 through 2015 for those tax years?

PETITIONER: Yes, Your Honor.

*Id.* at 66-68.

Petitioner then confirmed on the record that he understood by entering this guilty plea agreement, he was waiving all rights to appeal any non-sentencing, non-jurisdictional issues, including any issues related to pretrial motions, discovery, and the guilty plea. *Id.* at 76. Petitioner also acknowledged that he understood that by entering this guilty plea agreement he had waived his right to pretrial motions, including motions to suppress any evidence he believed was wrongfully obtained. *Id.* at 76-77. Petitioner also stated that he understood he was waiving his right to post-conviction relief, except for claims of prosecutorial misconduct or ineffective assistance of counsel.

THE COURT:  And you are also giving up your right to contest your conviction and your sentence in any form of post-conviction proceeding except for claims of prosecutorial misconduct and ineffective assistance of counsel; do you understand?

PETITIONER:  Yes, ma'am.

*Id*. at 78.

At the conclusion of the hearing, the Court accepted Petitioner's guilty plea on the tax fraud case, finding that Petitioner was competent to enter a plea of guilty, and his plea was made knowingly, intelligently, and voluntarily, and that it had a basis in fact that contained all of the elements of the offense charged in Count One of the Information.  *Id.* at 82.

<u>Sentencing</u>

On August 16, 2019, Petitioner was sentenced to a term of 24 months on Count 1 of the health care fraud case and a term of 24 months on Count 1 of the tax fraud case, the two terms to run concurrently, to be followed by three years of supervised release. Sentencing Tr., Crim. Doc. No. 97 at 54-55.[8]  Petitioner was ordered to pay restitution in the amount of $751,787 to the Internal Revenue Service and a fine in the amount of $20,000.  *Id.* at 55, 61.  The Court granted multiple requests to postpone Petitioner's surrender date, and Petitioner reported to the Bureau of Prisons on August 24, 2020. Crim. Doc. Nos. 84, 85, 87.  Petitioner was released from prison on January 14, 2022. He is currently on supervised release.

---

[8]     Petitioner was sentenced in the health care fraud case and the tax fraud case at the same hearing.  A copy of the sentencing hearing transcript is also lodged in the docket of Health Care Fraud case (4:17-cr-00297) at Doc. No. 889.

**Motion to Vacate**

On August 18, 2020, Petitioner filed this motion under 28 U.S.C. § 2255 to vacate

his guilty plea and sentence as to Count 1 of the 2018 tax fraud case on the basis of

prosecutorial misconduct.

Petitioner's Argument

The sole ground raised by Petitioner is that his guilty plea was based in part upon

evidence that was improperly gained by federal agents.  Specifically, Petitioner alleges

that IRS Special Agent Scott Daniels directed Petitioner's tax preparer, Chaudhry, to

approach Petitioner behind the back of his attorney and get him to sign and backdate

Form 8879,[9] a tax document necessary for prosecution under 26 U.S.C. § 7206(1).

Petitioner alleges that he did not sign Form 8879 for the 2013-2015 tax years at

the time the tax returns were filed.  Petitioner alleges that in June 2017 Chaudhry called

him out of the blue and told Petitioner that he needed to see Petitioner "immediately,"

and asked to meet at a McDonald's rather than his office.  Petitioner's friend and business

associate, Mohammad Attique, drove him to the McDonald's and waited in the car while

Petitioner met with Chaudhry.  Attique Decl., Doc. No. 13-1.

Petitioner alleges that at the meeting, Chaudhry told Petitioner to sign and

backdate three Form 8879s for the tax years 2013-2015 (the "Forms"), and to sign and

backdate them for Petitioner's wife as well.  Petitioner states that Chaudhry told him he

---

[9]     Form 8879 is a declaration document and signature authorization for an
electronically filed return filed by a tax preparer.  It acts as the functional equivalent of
the taxpayer's signature for the return.

needed these Forms to close out his file.  Petitioner states that he did not get copies of the Forms at the meeting.  In his § 2255 motion, Petitioner alleges that the only explanation for this behavior by Chaudhry was that the government needed these signed Forms in order to prosecute him for tax fraud. Petitioner also notes that the location of this meeting was suspicious and stated that it was a place "where two people meeting to sign papers can easily be observed by others, such as IRS agents."  Doc. No. 1-1 at 10.

Petitioner further alleges that the Forms are also suspicious because the 2013 form was dated October 15, 2014, a date when Petitioner was out of the country, and the 2014 and 2015 forms were also dated on days Petitioner was not in St. Louis.

Petitioner alleges prosecutorial misconduct, but also specifically states that he has "no indication that the prosecutor in this case sent the agents to cause Chaudhry to have [Petitioner] sign these forms," *id.* at 13, apparently ascribing the alleged improper conduct only to the agents.  Petitioner then argues that the use of these Forms by the prosecution in its case constituted ratification of this misconduct.

In his supplemental § 2255 brief, filed after the evidentiary hearing, Petitioner concedes "that it is murky as to whether the agents prompted Chaudhry to procure belated Form 8879s."  Doc. No. 36 at 6.  Petitioner further explains that whether or not the government actually told Chaudhury to have Rana sign the Forms "is not the point we press after the hearing, but rather that these Forms were signed years too late [to] support a conviction on the charge alleged."  *Id.* at 7.

<u>Respondent's Argument</u>

Respondent denies the allegations set forth by Petitioner.  Respondent argues that Petitioner's claims are inherently incredible for several reasons.  First, Respondent contends that the June 2017 meeting did not occur, pointing to the fact that Chaudhry sent the signed Forms to Agent Daniels in April 2017, two months prior to the alleged meeting.  Doc. No. 8-3.  Second, Respondent argues that the timing of Petitioner's claims is suspicious.  Respondent points out that Petitioner attempts to explain the two-to-three-year delay in raising the prosecutorial misconduct claims by asserting that he only recently hired a tax attorney, who explained why signing the Form 8879s was crucial to his offense.  But this explanation is without merit because Petitioner had the assistance of very experienced attorneys, including an experienced tax attorney and CPA, Harry Charles, before and after he entered his guilty plea.  At no time prior to this petition did any of Petitioner's attorneys mention issues of potential misconduct.  Lastly, both Chaudhry and Special Agent Daniels have denied in sworn affidavits that any June meeting occurred, and Chaudhry has sworn that he never met with Petitioner at the request or direction of a government agent.  Doc No. 8-1 at 24; Doc. No. 8-4, Chaudhry Aff., at 1.

Respondent also argues that any claims of pre-plea misconduct were foreclosed by Petitioner's plea agreement and his statements made during the plea colloquy.  Respondent further argues that there was no ratification by the Prosecutor of any alleged agent misconduct.  In order for there to be ratification of the misconduct, the Prosecutor must have knowledge of the misconduct, and Petitioner has presented no facts showing

that the Prosecutor knew of the alleged misconduct of Agent Daniels.  Petitioner even admits in his petition that he has no evidence that the Prosecutor directed Agent Daniels to obtain the signed Forms from Petitioner through Chaudhry, nor does Petitioner offer any evidence that the Prosecutor ratified the misconduct after the fact.

Respondent also raises the issue of potential witness tampering by Petitioner. Respondent presented evidence that on August 10, 2020, Chaudhry called the Prosecutor on this case and left a voicemail stating that Petitioner had recently contacted him and asked him to make statements that were not true.  Chaudhry felt Petitioner was pressuring and coaching him on what to say.  Later that same day, Special Agent Jordan and FBI Special Agent Michael Badolato conducted a telephone interview with Chaudhry.

Chaudhry told the agents that he was contacted approximately 10-12 days prior by a friend on behalf of Petitioner, who wanted to meet with Chaudhry.  On July 27, 2020, Chaudhry, Petitioner, and Attique met at Attique's office.  Petitioner asked Chaudhry to say that he had advised Petitioner that he did not have to report income earned in one business and then used to purchase a new business on his tax returns.  Petitioner told Chaudhry not to worry about getting in trouble because Petitioner would pay for his attorney.  Chaudhry felt that Petitioner was trying to put the blame on him.

A day or two later, during a call, Chaudhry told Petitioner's Attorney ("Attorney Markham") the opposite of what Petitioner wanted him to say.  Chaudhry stated that after the call, Petitioner was furious and intimidated and belittled Chaudhry.  Petitioner told Chaudhry that they had prepared him for two days, "like a parrot."  Doc. No. 8 at 20. Sometime prior to August 10, 2020, Chaudhry yielded to Petitioner's pressure and agreed

to type up a statement for Attorney Markham.  Petitioner told Chaudhry what to include, changed his wording, and corrected the spelling in the statement.  On August 10, 2020, Chaudhry sent a letter to Attorney Markham to inform him that his written statement was not true, and he only sent it because of Petitioner's pressure.  Chaudhry then called the Prosecutor to inform them of this incident.

Respondent also filed a supplemental brief following the evidentiary hearing and contends that Petitioner's testimony regarding when the Forms were signed is contradicted by his own testimony at both the plea hearing and the evidentiary hearing, and Petitioner's testimony regarding the meeting with Chaudhry at McDonald's is inconsistent and incredible.  Respondent further argues that Petitioner's motion based on prosecutorial misconduct is foreclosed by his knowing and intelligent guilty plea, but even if the prosecutorial claim were to be decided on the merits, Petitioner has offered no credible evidence that Agent Daniels ever enlisted Chaudhry to urge Petitioner to sign the Form 8879s and both Agent Daniels and Chaudhry deny that such a request was made and that the alleged McDonald's meeting occurred.  In sum, Respondent argues that Petitioner has failed to demonstrate prosecutorial misconduct and as such his § 2255 motion fails.

### Evidentiary Hearing of March 15, 2023

On November 9, 2022, the Court granted Petitioner's motion to set an evidentiary hearing in relation to his § 2255 motion.  Doc. No. 16.  An evidentiary hearing was held on March 15, 2023.  Petitioner testified in support of his motion and called Muhammed

Attique, Rashid Chaudhry, and his wife, Sumaira Rehan.  Respondent called Rashid

Chaudhry, Agent Scott Daniels, Attorney John Rogers, and Attorney John Mueller.

Petitioner testified that Chaudhry prepared his taxes from 2006 through 2016.

Doc. No. 34 at 20-21.  He testified that they primarily communicated via e-mail and each

year he would e-mail Chaudhry the numbers, expenses, costs of goods, business names,

etc., and Chaudhry would then prepare the taxes based on that information.  *Id.* at 21.  He

also testified that he was never prevented from reviewing his tax returns before they were

filed on his behalf.  *Id.* at 72.  Consistent with his petition, Petitioner testified that he did

not sign the Form 8879s for the years 2013, 2014, and 2015 on the date listed on the

forms, but rather, at Chaudhry's direction, Petitioner signed and backdated the Forms

during the first quarter of 2017.  *Id.* at 22-26.  Petitioner explained that sometime during

the first quarter of 2017, Chaudhry called Petitioner and asked to meet him at a local

McDonald's to discuss something important.  *Id.* at 26.  Petitioner testified that when he

met Chaudhry at the McDonald's, Chaudhry asked him to sign and backdate the Form

8879s for the 2013, 2014, and 2015 tax years.  *Id.* at 30-31.  Petitioner testified that he

agreed to backdate the Forms because Chaudhry was his CPA and an old-time friend.  *Id.*

Petitioner testified that Chaudhry also asked Petitioner to sign for Petitioner's wife while

at the McDonald's.  *Id.* at 32.  Petitioner's wife, Sumaira Rehan, testified that she did not

sign the Form 8879s for 2013, 2014 or 2015, and Petitioner had told her that he signed

the Forms on her behalf.  *Id.* at 143-47.

Muhammed Attique testified that he was present when Petitioner received the call

from Chaudhry asking Petitioner to meet at the McDonald's.  His testimony was largely

consistent with Petitioner's; he drove Petitioner to the McDonald's to meet with Chaudhry and waited in the car while the meeting occurred.  Attique testified that the meeting occurred in the first quarter of 2017.  Attique testified that he was in the process of firing Petitioner as a pharmacist at Imran because Petitioner was under criminal investigation.  He testified that he later found out that Petitioner was depositing large sums of money into the Imran Pharmacy account, and as a result, he removed Petitioner as a signatory to the account and switched banks.  *Id.* at 77-83, 85-87.

As to the 2020 meetings with Chaudhry, Attique testified that he, Petitioner, and Chaudhry met at Attique's office, and Petitioner asked Chaudhry to call Petitioner's attorney, John Markham, so he could ask Chaudhry some questions.  Attique testified that Chaudhry called Markham and left a voicemail.  He also testified that he never saw Rana threaten or try to intimidate Chaudhry at the meeting.  *Id.* at 83-85.

Chaudhry testified that while he occasionally met up with Rana at local McDonald's restaurants, he never asked him to come to a McDonald's in 2017 and sign the Form 8879s from 2013-2015.  *Id.* at 106.  He testified that on February 21, 2017, he sent Agent Daniels PDF copies of Petitioner's 2012, 2013, 2014, and 2015 taxes via e-mail, and on April 26, 2017, he sent Agent Daniels PDF copies of Petitioner's signed Form 8879s.  *Id.* at 104-06.  Chaudhry testified that Agent Daniels never asked him to contact Petitioner and have him sign the Form 8879s, nor did any other federal agent or law enforcement ever ask him to contact Petitioner to sign the Form 8879s.  *Id.* at 106.  He also testified that he never advised Petitioner that it was okay for him to sign his wife's name on the joint tax returns.  *Id.* at 110.

- 18 -

Agent Scott Daniels testified, consistent with his affidavit, that he received a number of tax documents from Chaudhry in February 2017 and upon reviewing the file, he realized he was missing the Form 8879s, so he asked Chaudhry to send him those Forms as well.  *Id.* at 129-30.  He believes he must have called Chaudhry to request the Forms, as he could not find any e-mail records of this request.  *Id.*  Agent Daniels testified that he received the signed Form 8879s from Chaudhry on April 26, 2017.  *Id.* at 130.  Agent Daniels testified that he never asked Chaudhry to contact Petitioner and have the Form 8879s signed, nor did he ever set up a clandestine undercover meeting at the McDonald's.  *Id.* at 132, 134.

Attorney John Rogers, Petitioner's attorney at the time of his plea, testified that he represented Petitioner in his health care fraud case as well as his tax fraud case.  *See id.* at 151.  He testified that they retained tax specialists and forensic accountants to review the tax returns and discovery.  *Id.* at 152.  He testified that upon review of the discovery, they advised Petitioner to take a plea deal because while Rogers thought the health care case was "thin," he was concerned about Petitioner's potential exposure under the tax case, and an ongoing investigation into another of Petitioner's businesses.  *Id.* at 152-54.

> PETITIONER'S COUNSEL:  Okay. And when you and Mr. Rana were when you were analyzing his tax circumstances with all the qualified help that you had, you informed him that his taxes didn't really pass the smell test. Fair enough?
>
> JOHN ROGERS:  Yes.  The collective group of us that were meeting together as well as myself informed him that we were concerned that it would be a fairly easy tax prosecution.

*Id.* at 158.  Rogers also testified that he represented Petitioner in 2017, and Petitioner never told Rogers that he was approached by Chaudhry to sign and backdate the tax Forms.  *Id.* at 156.  Rogers also testified that their retained tax specialist also interviewed Chaudhry and there was no mention of this issue.  *Id.*  Rogers stated that he did not know whether he ever saw the executed Form 8879s during his discussions with Petitioner.  *Id.* at 158.

Lastly, Attorney John Mueller, another one of Petitioner's former attorneys, testified that he had no recollection of Petitioner telling him about Chaudhry asking Petitioner to meet at McDonald's and sign the Form 8879s.  *Id.* at 164.  Additional testimony will be discussed further with respect to the parties' specific arguments.

**<u>Petitioner's Passport</u>**

During the evidentiary hearing, Petitioner argued that he was out of the country on the dates the relevant Form 8879s were signed and his passport would confirm these dates.  Petitioner asked the Court to assist with the return of his passport, which was surrendered during his underlying criminal case on September 8, 2017.

The Court inquired with the Clerk's office about the status of Petitioner's passport, and it was determined that per protocol, the passport was surrendered to the State Department upon Petitioner's conviction.  Doc. No. 37.  On June 21, 2023, Petitioner was informed by the State Department that his passport expired in August 2021, and per standard procedure, the passport was destroyed upon expiration.  Doc. No. 41-1.[10]

---

[10]     The instant § 2255 motion was filed on August 18, 2020, a year prior to the expiration of Petitioner's passport.  But Petitioner made no formal request for the return

In light of this, Petitioner asks the Court to either accept as true his testimony that he could not have signed the relevant Form 8879s on the dates listed on the Forms because he was out of the country or traveling or to reopen the evidentiary hearing.  The Court sees no reason to reopen the evidentiary hearing, because even if the Court were to accept, for the purposes of this motion, that Petitioner was in fact out of the country and did not sign the Form 8879s on the dates listed, but rather signed and backdated the Forms upon Chaudhry's request at some later unknown date, it has no impact on his prosecutorial misconduct claim, as discussed in more detail below.

## DISCUSSION

Pursuant to 28 U.S.C. § 2255, a federal prisoner in custody may seek relief from a sentence imposed against him on the grounds that "the sentence was imposed in violation of the Constitution or law of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack."   28 U.S.C. § 2255.  Section 2255 provides a statutory avenue by which to remedy constitutional or jurisdictional errors, or errors of law rising to the level of "a fundamental defect which inherently results in a complete miscarriage of justice."  *Hill v. United States*, 368 U.S. 424, 428 (1962).  While Petitioner's plea agreement contained a waiver of appeal, it preserved any post-conviction claim based on prosecutorial misconduct.  Accordingly, Petitioner's claim of prosecutorial misconduct is appropriately raised under § 2255.

---

of his passport until the evidentiary hearing.

Petitioner also satisfies the "custody" requirement of § 2255 despite completing his concurrent prison sentences on January 14, 2022, as he subsequently began and still serves his three-year term of supervised release. "If a petitioner, though released from custody, faces sufficient repercussions from his allegedly unlawful punishment," inclusive of supervised release conditions, "the case is not moot." *Leonard v. Nix*, 55 F.3d 370, 372-73 (8th Cir. 1995). Even after release, any collateral consequences are presumed to flow from the criminal conviction. *Id.* at 373; *see O'Neil v. United States*, 966 F.3d 764, 770, n.4 (8th Cir. 2020) ("[Petitioner's] ineffective-assistance-of-counsel claims . . . turn on the validity of his conviction, not the validity of his sentence. Therefore, we presume that those claims bore collateral consequence and are not mooted by his release.")

## **Prosecutorial Misconduct**

"As a general rule, 'prosecutorial misconduct does not merit federal habeas relief unless the misconduct infected the [proceedings] with enough unfairness to render [a] petitioner's conviction a denial of due process.'" *Stringer v. Hedgepeth*, 280 F.3d 826, 829 (8th Cir. 2002) (quoting *Louisell v. Dir. Of Iowa Dept. of Corr.*, 178 F.3d 1019, 1023 (8th Cir. 1999)). A two-part test governs such claims, requiring Petitioner demonstrate "first, the prosecutor's conduct . . . must have been improper, and second, the . . . conduct must have prejudicially affected the defendant's substantial rights by depriving the defendant" of due process. *United States v. White*, 241 F.3d 1015, 1023 (8th Cir. 2001) (citation omitted).

As to demonstrating prejudice, Petitioner "must show that there is a reasonable probability that the error complained of affected the outcome"—here, Petitioner's decision to plead guilty—such that "absent the alleged impropriety the [outcome] probably would have been different." *Id.* (citations omitted).  In making such a determination, it is necessary to "consider the cumulative effect of the misconduct," as well as "examine the strength of the [unchallenged] evidence of the defendant's guilt," the former weighed against the latter.  *Graves v. Ault*, 614 F.3d 501, 508 (8th Cir. 2010) (citing *United States v. Beeks*, 224 F.3d 741, 745 (8th Cir. 2000)).  Additional considerations in this assessment are "the representations of the defendant, his lawyer, and the prosecutor at [his plea] hearing, as well as any findings made by the judge accepting the plea," which "carry a strong presumption of veracity."  *Blackledge v. Allison*, 431 U.S. 63, 73-74 (1977).

It is not necessarily fatal to Petitioner's claim that the misconduct is alleged on the part of a federal investigating agent as opposed to a United States prosecutor.  *See Waley v. Johnston*, 316 U.S. 101, 104 (1942) ("For a conviction on a plea of guilty coerced by a *federal law enforcement officer* is no more consistent with due process than a conviction supported by a coerced confession.") (emphasis added); *Brady v. U.S.*, 397 U.S. 742, 757 ("[A]bsent misrepresentation or other impermissible conduct by *state agents*, a voluntary plea of guilty intelligently made . . . does not become vulnerable because later judicial decisions indicate that the plea rested on a faulty premise.") (emphasis added).

When the conduct of a law enforcement agent, as opposed to a prosecutor, is at issue, the question is whether the agent's conduct was "so outrageous that due process

principles bar the Government from using the judicial process to obtain a conviction." *United States v. Bugh*, 701 F.3d 888, 894 (8th Cir. 2012). Under this standard, an agent's conduct is considered outrageous when it violates "that fundamental fairness, shocking the universal sense of justice, mandated by the Due Process Clause of the Fifth Amendment." *United States v. Russell,* 411 U.S. 423, 432 (1973).

The Eighth Circuit has left open the possibility that, in rare instances, the investigative methods employed by law enforcement could be "so outrageous that due process bars the government from invoking the judicial process to obtain a conviction." *United States v. King*, 351 F.3d 859, 867 (8th Cir. 2003). However, more recently, the Eighth Circuit identified only two cases—both from the 1970s—in which a court of appeals deemed the Government's conduct so outrageous as to violate due process. *United States v. Combs*, 827 F.3d 790, 794 (8th Cir. 2016) (citing *United States v. Twigg*, 588 F.2d 373 (3d Cir. 1978) and *Greene v. United States*, 454 F.2d 783 (9th Cir. 1971)).

In order for Petitioner to succeed on his prosecutorial misconduct claim, as it relates to Agent Daniels, or any other law enforcement agent's conduct, he must establish that the agent's conduct shocked the universal sense of justice mandated by the Due Process Clause.

Here**,** there is simply no evidence of misconduct by any member of the prosecutorial team. Petitioner urges the Court to essentially read between the lines in order to find that prosecutorial misconduct occurred. In order to make this finding, the Court would need to find that (1) the Form 8879s were not signed on the date listed, and Petitioner lied under oath at his plea hearing when he said they were signed on the dates

- 24 -

written on the Forms; (2) Chaudhry asked Petitioner to meet at a McDonald's some time prior to April 26, 2017 in order to have him sign and backdate the Form 8879s; and most importantly, (3) Agent Daniels directed or urged Chaudhry to set up this meeting, or otherwise knew the Forms were backdated.  Even assuming the Court found in favor of Petitioner on the first two issues, there is no evidence that any member of the Prosecutorial team, including the investigating agents, had any involvement, ratification, or knowledge of Petitioner's decision to sign and backdate the Forms.  Regardless, each issue is discussed in detail below.

**Signatures - Form 8879s**

Petitioner claims that he did not sign the 2013-2015 Form 8879s on the dates listed.  Specifically, he contends that he did not sign the 2013 Form 8879 on October 15, 2013; did not sign the 2014 Form 8879 on October 14, 2015; and did not sign the 2015 Form 8879 on October 14, 2016.  Petitioner claims he did not sign these Forms until sometime in 2017 when he was asked by Chaudhry to sign and backdate the Forms.  This testimony is contrary to Petitioner's testimony at his plea hearing where he specifically admitted to signing the 2013 Form 8879 on or about October 15, 2014.  Crim. Doc. No. 96, at 67-68.  And despite having new, experienced counsel to represent him following the plea, he did not raise the issue prior to sentencing.

In this regard, it is important to note that Petitioner does not deny that he, at some point,[11] willingly and knowingly signed the Form 8879s for the 2013, 2014, and 2015 tax

---

[11]     The Court acknowledges that even if it were to assume that Petitioner was out of the country on the dates listed on the Forms, it would not foreclose the possibility that

years.  Nor does Petitioner ever deny that he knowingly and materially misrepresented the information he provided to Mr. Chaudhry which was used to prepare his tax returns.  *See* Doc. No. 34 at 70.  In fact, at the evidentiary hearing, Petitioner confirmed he reviewed his tax returns with his attorney prior to his plea and admitted under oath that his 2013, 2014 and 2015 tax returns were false.  *Id.* at 69-72.

> THE COURT:  And then you came into court and stated under oath that your 2013 tax returns were false?
>
> PETITIONER:  Yes, Your Honor.
>
> THE COURT:  And your 2014 tax returns were false?
>
> PETITIONER:  Yes, Your Honor.
>
> THE COURT:  And you 2015 tax returns were false?
>
> PETITIONER:  Yes, Your Honor.
>
> THE COURT:  And you had the opportunity to review each of those tax returns prior to your plea?
>
> PETITIONER:  Yes, Your Honor.

*Id.* at 71-72.

Indeed, Petitioner never claims that he did not in fact knowingly submit false tax returns; he only claims that he did not sign the 2013, 2014, and 2015 Form 8879s until sometime in early 2017, when he knowingly and willingly signed and backdated all three

---

Petitioner signed the Forms and returned them via e-mail on those dates.  Petitioner could have received the Forms via e-mail, signed them, and returned the Forms via e-mail to this accountant.  In fact, Chaudhry testified that this was a common practice with Petitioner due to Petitioner's frequent travel.  Doc. No. 34 at 93-93, 100.  However, such a finding is not necessary to the disposition of this motion.  As such, the Court declines to reopen the evidentiary hearing.

Forms, and forged his wife's signature.  This is only further evidence of Petitioner's fraudulent behavior in providing false information to the IRS.  However, and most crucially to this motion, there is no indication that any IRS agent or member of the prosecutorial team was involved with, knew of, or ratified Petitioner backdating and signing the Form 8879s.  Petitioner now appears to admit he has no such evidence.  He now simply asserts in his post-hearing brief that the Forms were signed too late to support a conviction, essentially challenging the sufficiency of the evidence.

### 2017 Meeting at McDonald's

Petitioner's testimony about the alleged meeting with Chaudhry at McDonald's in 2017 where Chaudhry convinced Petitioner to sign and backdate the Form 8879s is inconsistent.  In his initial motion, Petitioner alleges under oath that the meeting occurred with Chaudhry in or around June 2017.  *See* Decl. of Rehan Rana., Doc. No. 1-3.  In its opposition, Respondent explained and provided evidence that Agent Scott Daniels received the signed Form 8879s from Chaudhry via e-mail on April 26, 2017, therefore there would be no need for Chaudhry to meet with Petitioner two months later to obtain the signed Forms.  In response, Petitioner filed a reply which included a declaration from Attique which claimed that the meeting occurred "in or around January 2017."  Attique Decl., Doc. No. 13-1, at ¶¶ 3-5.  At the evidentiary hearing, Petitioner changed his testimony yet again and claimed that the meeting with Chaudhry occurred during "the first quarter of 2017."  Doc. No. 34 at 26.  However, on cross-examination, Petitioner admitted that he did not know when the meeting occurred,

RESPONDENT:     Earlier, did you not tell your counsel that this meeting

|  | happened in June of 2017? |
|---|---|
| PETITIONER: | In the start, I might have.  But, you know, I'm not -- I don't remember that long of a thing.  So it could have been June or July or April or May.   Something -- something – something around those times. |
| RESPONDENT: | Are you now changing that date, sir, because you found out that the IRS agent received the signed forms in April of 2017, so you're backing it back? |
| PETITIONER: | That is your assumption ma'am. |

*Id.* at 59.  Attique also testified that the meeting occurred sometime in the first quarter, which is consistent with, although broader, than his statement in his declaration that the meeting occurred in January 2017.  *Id.* at 85.

Additionally, Plaintiff never mentioned this meeting to any of his attorneys, including the tax specialists that were working on his case, despite the fact that he was under criminal investigation at the time of the alleged meeting and had already been subpoenaed by the IRS.  Had Chaudhry asked Petitioner to sign and backdate tax forms for the years which Petitioner knew he was under investigation, one would expect Petitioner to alert his attorneys.  Yet, there was no mention of this 2017 meeting until this instant motion in 2020.

Petitioner claims that he did not realize what a Form 8879 was, or the significance of it, until he retained his current attorney John Markham in this § 2255 matter, despite having a team of tax specialists and attorneys in 2017, and new, experienced counsel in connection with sentencing.  The Court does not find Petitioner's assertion to be credible.  First, it is refuted by the plea agreement itself.  The plea agreement, which Petitioner

- 28 -

admitted he reviewed, understood, and reviewed with counsel, specifically lists as elements of the charge that (1) he "made and *signed* a return, statement or other document which was false as to a material matter;" and (2) "the return, *statement, or other document contained a written declaration* that it was signed under the penalties of perjury."  Crim. Doc. No. 6, at 3  (emphasis added).  The only documents signed by Petitioner in connection with his materially false tax returns were the Form 8879 and 8879S documents.  Paragraphs 4(e) & (f) of the Facts recited in the plea agreement not only expressly reference the Forms, but explain their significance.

> e.     Before electronically filing Rana's 2013, 2014, and 2015 individual tax returns in the Eastern District of Missouri, Chaudhry obtained Forms 8879 and 8879S from Rana, authorizing Chaudhry to transmit Rana's individual tax returns, as well as the associated 1120S for St. Louis Hills Pharmacy, to the Internal Revenue Service.  Rana signed each of the Form 8879s under the penalties of perjury.  As a result of his under-reporting of his income, Rana owes $751,787 for the 2013-15 tax years.

> f.     On or about October 15, 2014, Rehan Rana did willfully make and subscribe his 2013 individual tax return, which contained or was verified by a written declaration that it was made under the penalties of perjury, and which Rehan Rana did not believe to be true and correct as to every material matter, in violation of Title 26, United States Code, Section 7206(1).

Crim. Doc. No. 6, at 4-5.

During the plea colloquy, the Forms were again emphasized.  The prosecutor specifically stated that Petitioner, "by providing the information to his tax preparer, caused the creation, issuance and filing of false documents related to his tax returns *and signed the forms that are required to authorize the submission of those forms, specifically Forms 8879 and 8879S.*"  Crim. Doc. No. 96, at 66 (emphasis added).   In response to the Court's question, Petitioner reaffirmed, under oath, that these facts were true.  Thereafter,

- 29 -

in response to the Court's questions, Petitioner expressly acknowledged that he did "in fact sign a tax return on or about October 15, 2014, that materially understated [his] taxes,'' that he signed under penalty of perjury, and understood what he was doing. *Id.* at 66-68.

Finally, as discussed at the evidentiary hearing, the purpose of the Forms is clear on the face of the Forms themselves.  Having had an opportunity to observe and evaluate the evidence and the testimony, the Court does not find credible Petitioner's testimony at the evidentiary hearing that he did not realize what the Forms were or their significance. Rather, the Court finds that Petitioner understood the purpose and import of the Forms when he signed them on his own behalf, and when he forged his wife's signature to the Forms on her behalf.  Although the Court can only speculate whether Petitioner signed the Forms because he believed it would be helpful to complete the tax fraud he was attempting to conceal, or for some other purpose, the Court finds he signed the Forms knowingly and voluntarily and with full understanding of their purpose.  If in fact he backdated the Forms, he cannot now belatedly use any delay in signing the Forms to try to undo his knowing and voluntary guilty plea.

**Agent Misconduct**

Even accepting, for purposes of this motion, that the meeting with Chaudhry occurred, Petitioner's motion still fails.  There is no evidence that Agent Daniels or any other agent was involved with or had knowledge of the meeting, or ratified the actions. Petitioner initially urged the Court to make the following inference,

The agents have denied any involvement but there is sufficient evidence

> warranting a hearing that an inference can be drawn that, as the tax investigation was winding up, the agents realized that the tax returns at issue were not subscribed which is an element of the offense. That evidence is that Chaudhry called Rana in 2017 to "immediately" come and sign these forms and to do so in a public place (a local McDonald's) rather than Chaudhry's office where they usually met. A public place would allow agents to be present and observing which they certainly could not do surreptitiously at Chaudhry's office.

Doc. No. 13 at 3. There is simply no evidence of this. Both Agent Daniels and Chaudhry testified, consistent with their affidavits, that neither Agent Daniels nor any other agent ever directed or instructed Chaudhry to set up a meeting with Petitioner to obtain signatures and backdate the Form 8879s.[12] The Court finds this testimony to be wholly credible. Even Petitioner concedes, after the evidentiary hearing, that "it is murky as to whether the agents prompted Chaudhry to procure belated Form 8879s." Doc. No. 36 at 6.

After the evidentiary hearing, Petitioner seemingly abandons his original prosecutorial misconduct claim regarding the alleged clandestine meeting orchestrated by Agent Daniels and instead claims that the Form 8879s were simply signed too late to support a conviction of the charge alleged, and the delayed signing of the Forms alone is enough to support a claim of prosecutorial misconduct. This argument is unavailing, Petitioner does not provide any authority or explanation for how backdated Forms,

---

[12]   Nor is there any basis to infer an improper motive or conduct from the agents' actions. The record reflects that tax documents were subpoenaed from the tax preparer, Chaudhry. Upon review, the documents were determined to be incomplete. The agent requested the remaining documents from Chaudhry, and he thereafter promptly provided the Forms. There is nothing out of the ordinary, much less improper, regarding these actions.

without any knowledge, ratification, or misconduct by the government constitutes prosecutorial misconduct or is otherwise grounds for relief under § 2255.  All Petitioner provides is a vague cite to an inapplicable Supreme Court case that states, "[i]f the suppression of evidence results in constitutional error, it is because of the character of the evidence, not the character of the prosecutor."  *U.S. v. Agurs*, 427 U.S. 97, 110.  There was no suppressed evidence here.  Even assuming the Forms were backdated there is no evidence that that agents knew or had any reason to know that the Forms provided by Chaudhry were backdated.

In any event, whether the Forms were backdated is irrelevant to this motion. Petitioner swore under oath at his plea hearing that he (1) knowingly and materially understated the amount of distributions he had received to his tax preparer, (2) he signed a tax return on October 15, 2014, and (3) he understood that he was signing a false tax return in order to pay less income tax than he owed.  Doc. No. 96 at 86-88.  Further, even under Petitioner's scenario, he signed the Forms before his guilty plea.  Thereafter, Petitioner knowingly waived his right to appeal on any non-jurisdictional, non-sentencing issues, including any issues related to pretrial motions, discovery, and the guilty plea. Thus, Petitioner's latest argument, that the evidence is insufficient to support a conviction, is foreclosed by his appellate waiver.

Petitioner also waived his right to post-conviction relief, except for claims of prosecutorial misconduct or ineffective assistance of counsel.  *Id.* at 76, 78.  Here, Petitioner only alleges prosecutorial misconduct, and as discussed, Petitioner's claims are unpersuasive and contrary to the record.  Based on the entire record, and having the

opportunity to evaluate the demeanor of the witnesses at the hearing, the Court finds that there is simply no evidence of prosecutorial misconduct.

**CONCLUSION**

Accordingly,

**IT IS HEREBY ORDERED** that Petitioner Rehan Rana's motion filed under 28 U.S.C. § 2225 to vacate, set aside, or correct his sentence is **DENIED**.  Doc. No. 1.

**IT IS FURTHER ORDERED** that this Court will not issue a Certificate of Appealability as Petitioner has not made a substantial showing of the denial of a federal constitutional right as required by 28 U.S.C. § 2253(c)(2).

A separate Judgment shall accompany this Memorandum and Order.

AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 19th day of July, 2023.